WILLIAM H. ELLIOTT AND OTHERS *vs.* THE FAIR HAVEN AND WESTVILLE RAILROAD COMPANY.

[Superior Court. New Haven County, October Term, 1860. Before ELLSWORTH, J.]

The authority to lay and use a horse railroad track in a public street is not a new servitude imposed upon the land, for which the owners of the fee are entitled to compensation, but is a part of the public use to which the land was originally subjected when taken for a highway.

BILL for an injunction against the laying of a horse railroad track in a public street in the city of New Haven, brought by sundry owners of lands lying upon the street. The facts, as well as the points made by the petitioners' counsel, are sufficiently stated in the opinion.

*R. I. Ingersoll, C. Ives* and *Doolittle*, for the petitioners.

*Dutton* and *L. G. Peck*, for the respondents.

ELLSWORTH, J.   From the best consideration I am able to give this case, aided as I have been by the researches and arguments of counsel, I am constrained to decide upon the proof before me, if not upon the bill itself, that the petitioners are not entitled to the relief prayed for ; and I therefore pass by all formal objections to the bill.

They complain that the respondents are about to impose a new *servitude* upon their soil and freehold, by placing thereon a track of iron suitable for a railroad.   I find the road which the respondents are about building to be a horse railroad, in distinction from one of the common character where steam is used as the motive power.   No other than a horse railroad can be constructed or enjoyed under the charter before me.

This then is the road which they insist is a new servitude, and ought not to be constructed on their freehold without a new assessment of damages, though it is conceded that the land has been already condemned for a public highway, and paid for.

This presents a question of some interest and importance, one that is new in the courts of this country so far as I can learn from books within my reach or from the references of counsel ; and it is this silence, while horse railroads have existed for years and are greatly multiplied in all the chief cities of the United States, that induces me to believe there can be nothing in the petitioners' claim.   Were it otherwise I think the objection must have been discovered ere this, for such roads have, in this country, encountered opposition in every form.   The position assumed is, that a horse railroad is a new and additional servitude.   If so, there must be some provision for indemnifying the owners for appropriating their soil and freehold ; but if it be otherwise, if it be a mere *modification* of an existing servitude, a modification called for by the necessities of the public, as I think the fact is, then the petitioners have no case, and should have addressed themselves, as they still may, to the legislature rather than to a court of justice.

In deciding upon the character and extent of this servitude we must carefully consider the mode and manner in which

the respondents intend to build and use their road, else we can not ascertain the true character of the new and modified use of the highway. The terms of the charter may, as said by Chief Justice Redfield in his Treatise on Railways, page 160, have a material bearing upon the question whether the servitude is new and additional. The rails are to conform to the grades of the streets now existing or hereafter established by the common council of the city of New Haven ; and they are to be laid down without cuttings or embankments, or other changes in the highways, calculated to affect the present modes and lines of travel. Hence it follows that when the rails are fixed, vehicles can pass over them crosswise or longitudinally without obstruction, and travel upon them, as is done in most of the cities, at pleasure. It has likewise been testified by a professed engineer that a horse car passing along the track at the ordinary rate can be stopped in about four feet.

I am satified that horse railroads do not come under the general statute with regard to railroads passed in 1849. Hence they may, and I think they should, be distinguished from general railroads upon the question of servitude, wherever that question arises. This is most obvious upon a slight view of several of the sections of the general statute. Very many of its provisions are certainly inapplicable to horse railroads, and others can have little or no relation to them ; from which I infer that the legislature in enacting the general statute had not in view horse railroads, confined as they mostly are to cities and their suburbs. I refer particularly to sections 2, 3, 4, 12, 13, 17, and 22, of the act of 1849 ; to the act of 1850 ; to sections 1 and 2 of the act of 1851 ; and to sections 1, 3 and 4 of the act of 1853.

We come then to the question whether this horse railroad is a new and additional servitude upon the soil and freehold, or fee, as we sometimes say, of the highway. To my mind it is not. It has no such character. Let the existing servitude or highway be defined with intelligence and accuracy, and the definition will be found to embrace *all public travel not prohibited by law*, on foot, in carriages, omnibuses, stages, sleighs,

or other vehicles, as the wants and habits of the public demand. The power to regulate this franchise, to prescribe the manner and mode in which it may be used, is certainly vested in the legislature quite as much as is the original right to provide the highway at all, and certainly it is their imperative duty, by themselves or subordinate authorities, to provide all necessary highways, bridges and ferries. Whether this power is exercised by municipal corporations, or other corporations, or by individuals unincorporated, or by the legislature itself, can make no difference in the nature and extent of the servitude itself. It is the same in each case, and adjoining proprietors have nothing to do with the modification or regulation of it, except as other citizens through those whose business it is to provide and regulate highways. This follows from the fact that their land has been regularly condemned and paid for, for all public travel. Nothing is more absurd than that the mode of traveling is to be subject to their will and pleasure, and not to the supervision and determination of the legislature. If the legislature are satisfied that one mode is better than another they may certainly allow it, and grant charters where necessary to secure that mode. If companies or corporate bodies will alone undertake the enterprise, it is both legal and proper to intrust it to them, rather than to overburden municipalities which may have little or no interest in its success. This power has hitherto been thought to be both proper and necessary. Is it not exercised whenever turnpikes are chartered, especially along and over old highways, or whenever bridges or ferries are chartered with right of toll ? The franchise or servitude is the same ; it is but a highway still ; or, in other words, it is the right of the public to travel as their necessities or convenience require. And what is said about the fee being in the owners of the lots bounded on the street, though correct enough in theory and important in a certain point of view, is not of the slightest importance in deciding upon the right of the legislature to regulate the public travel, whether by horse cars or omnibuses drawn over the road, upon iron, earth, stone or timber. This matter of using the highway for travel ought to be looked at with the

eye of common sense, rather than with an over-nice techni-
cality, provided the right itself is admitted to be fully in the
public. Is the servitude, I ask, a new one because the mode
of traveling by the people is new ? Is it more than the pub-
lic require ? If not, I must insist that it is not new because
the *form of the vehicle* is new, however proper it may be for
the legislature to provide for special damages to adjoining
owners.

It is said that the servitude is new because the respondents
get an exclusive right to their track, one which may last lon-
ger than the highway itself. This again is very unsatisfactory
to my mind. It is not so certain that their right will outlast
the authorized highway, certainly the right is given to facili-
tate travel in the highway—the language of the charter being
" the line of the highway ; " and when these highways in the
city of New Haven are legally discontinued and disused, it is
quite probable that the entire travel, railroad and all, will of
necessity cease. Certainly the legislature may so order.

And as to the supposed exclusive right, it is not so except in
a qualified sense ; not more than the legislature are in the
practice of allowing whenever it is found necessary for the full
enjoyment by the people of a public franchise. Can not the
legislature apportion or regulate a franchise for the general
good ? Can they not and do they not charter turnpike com-
panies with power to take toll, or companies to build bridges
or raise causeways on existing roads ? Suppose it to be ascer-
tained by experience that a stage coach can not be supported
on a certain road without it can take all that kind of travel,
may not the legislature give a charter for that purpose upon
condition that the company will raise the road, or bridge it, or
pave it and keep it in repair ? And yet this is in a sense an
exclusive right, but not in an offensive sense ; nor does this
modification change or enlarge the servitude. Nor in fact can
the horse railroad in question be said to be absolutely exclu-
sive. The legislature can still license as many other roads as
they find necessary, and when they are finished the people
can travel as freely as they could if they were not there,
except that if a car is coming toward them they may be
obliged to turn out, just as they would if in riding on horse-

back they should meet a load of hay. The truth is that any supposed exclusive power or privilege in the respondents, confined as they are to a given line of the path, is quite too insignificant to found thereon an argument of exclusiveness and monopoly. The legislature have often passed laws quite as exclusive, in requiring persons on the highway to stop for a time, or check their pace, or turn to the right or left, or to go entirely around in passing others. They have always made numerous distinctions among the vehicles on the road. If now a new modification has become expedient, and horse cars are introduced to meet that want, the legislature may well license a track of iron suitable for their use. And the common law requires due care and forbearance among travelers when they meet or overtake each other, and neither can insist upon an absolute right irrespective of that of the other. This very question has recently been elaborately examined and decided in the supreme court of Massachusetts. In *Commonwealth* v. *Temple,* reported in the Law Reporter for October, 1860, Ch. J. Shaw lays down the law in harmony with the view I have taken. This was the case of a heavy loaded wagon passing along the track of a horse railroad in Boston, when it was overtaken by one of the cars. The court not recognizing any absolute right on the part of one mode of traveling over another, decided that the parties must act discreetly and fairly as to each other; and in applying the rule to the facts in the case, they held that the wagoner was in fault, and fined him for his conduct; but not a word is heard from the court to the effect that a horse railroad is exclusive, or in any way in contravention of the laws or constitution of the commonwealth. It is quite worthy of notice too, that in all the charters for horse railroads in Massachusetts which have been read to me, damages for land " taken " are given only when private lands, and not highways, are made use of. The same court in Massachusetts had before them, on the same circuit, another case reported in the same number of the Law Reporter, *Grew* v. *The Broadway R. R. Co.,* which was severely contested by able counsel on every point of law and fact. The case involved the point of making horse railroads

in many of the important streets and some of the narrow ones in the city of Boston ; and here too, not a word is heard about incumbering the fee of the highway with a new servitude, although in an early case, *Craigie* v. *Mellen*, 6 Mass., 7, it had been decided that the fee of the highway is in the adjoining owners.

There is a general statute in Massachusetts giving adjoining owners a right to recover special damages against towns and cities, which by their agents injure their lands by making excavations or embankments, though it is done of necessity and in a prudent manner, in repairing or altering highways. This statute probably extends to all corporations, but if so it applies only to special damages to adjoining lands, and not to general and common damages which arise of course (if the petitioners are correct,) from placing an iron track upon the soil and freehold of the highway. This is a very proper statute, and one which might well be adopted elsewhere, for in the language of Ch. J. Redfield, in his Treatise on Railways, it is confessedly competent for the legislature to require railway corporations, in laying their track along the highway, to compensate adjoining owners for any increased detriment to them, though it be in the nature of consequential damage. We have substantially such a law in this state as to railway corporations, for our courts, in the construction of the words " shall pay all damage that shall arise to any person or persons," which are generally found in the charters, have held that consequential damages can be recovered. It was so held in *Bradley* v. *N. York & N. Haven R. R. Co.*, 21 Conn., 294 ; *Nicholson* v. *the same*, 22 Conn., 74 ; *Hooker* v. *N. Haven & Northampton Co.*, 14 Conn., 146 and 15 Conn., 312 ; and in *Denslow* v. *the same*, 16 Conn., 98. These companies were held liable in case for special damages for acts done under legislative authority. In English charters the words " injuriously affected " have been held sufficient for the recovery of like damages. In analogy to these cases, if we assume the servitude in question to work special damage to the respondents' inclosures, I see not why each one may not recover any special damage he can establish by proof.

The 6th section of the respondents' charter, to which my attention has been called, as providing damages for lands of a *femme covert*, &c., taken, throws very little light on the question in issue, for the road will doubtless more or less pass through private lands at the west end, in which case land may be taken, and if I am correct in what I have already said, it will not be taken in any other case.

The greatest difficulty I have had in this case is to distinguish it from that of *Imlay* v. *Union Branch Railroad Company*, reported in 26 Conn., 249; but I think it is distinguishable, practically so, certainly; and on this ground I hold that the doctrine there laid down is not applicable here. That was an amicable case on facts mutually agreed upon in order to obtain (under the statute) the opinion of the supreme court without suit. A general railroad had been granted to the Union Branch R. R. Co. to be made in a portion of Commerce street, in the city of Hartford, which is one of the narrowest streets in the city. In the charter there was no restriction as to the width of the railroad or the manner of its construction, whether with or without cuttings and embankments, except what is found in the general railroad act of 1849 and the acts amendatory thereto. In fact the road was treated throughout as made or about to be made under that act, and to be clothed with the ordinary attributes of a railroad; and a horse railroad on the grade of the street was not even thought of. The track there being laid was found to have in places embankments " so high as to create an unsightly obstruction before the doors and windows of buildings, and to impede the approaches from the roadway to stores, warehouses and dwellings." Here was a positive nuisance, and the plaintiffs claimed that damages should be appraised—1st, for taking their soil in the highway; 2d, for injuries to adjoining lands resulting from such an appropriation of the highway; and 3d, for injuries resulting to their stores and dwellings from the embankments raised in the highway. Here was enough to show, beyond all question, that the railroad company were proceeding at their peril, and ought to pay damages for some or all of their acts. The court did undoubtedly say that damages must be paid for the soil

and freehold of the highway, for the works contemplated were a new and additional servitude. That opinion, however, I think is applicable only to a case like the one before the court, *a railroad constructed and used under the general law of the state ;* and I do not believe my learned brethren intended to pass upon a horse railroad constructed and used as the present is to be. I find the Chief Justice, in giving the reasons for the decision, saying in effect, that if the new use of the land is within the scope of the original sequestration or dedication, it would follow that the railway privileges are not an encroachment on the estate remaining in the owner of the soil, and that a *new mode* of enjoying the public easement will not enable him to assert a claim to damages therefor ; and further, that in that particular case the court had simply to decide whether there is such an identity between a highway and a railway as that they may be treated substantially as the same easement or servitude, or as being designed for the same objects and uses. If so he admits that the plaintiffs have no case, but he thought there was not such an identity. Now, in my judgment, this horse railroad is essentially different from that in its chief characteristics, and therefore, in deciding upon this servitude, I am bound to look at the circumstances which distinguish the two cases. The former, as I have already said, was a railroad under the statute of 1849, to be constructed and used according to the provisions of that act and the amendments thereto, such as the width of the road, its cuttings, embankments, locomotives with their tenders and trains, rapid and dangerous in their progress, its fires, steam whistles, bells, and other accompaniments, making the highway *inconvenient* or *impassable*. These things might well be held to be most important in that case, as giving character to the servitude complained of, although there are very great authorities denying even this distinction ; but however that may be, none of these circumstances are found in this case. There are no cuttings, no embankments, no locomotives, no tenders nor trains, no rapid or dangerous progress, no fire, steam whistles or bells, but only a jogging horse with a species of

---

---

omnibus attached, stopping every few rods to take in and let out passengers.

If in making this distinction I have fallen into an error, I am happy to know that my opinion can be reviewed and reversed by our learned Court of Errors ; and that an action at law can be brought to try the question in issue in another form by a jury. Entertaining these views, I dismiss the bill.