# THE JERSEY CITY AND BERGEN RAILROAD COMPANY vs. THE JERSEY CITY AND HOBOKEN HORSE RAILROAD COMPANY.

1. A condition in a city ordinance granting permission to a street car company to lay rails in the streets, that another street car company named should be permitted to use the track on terms to be settled by the city council, is not a contract with such other company, but only between the first company and the city.

2. The municipal government has power to discharge the company to whom such permission was granted from the condition contained in the contract, and when once discharged, cannot again make such company subject to the condition.

3. An ordinance fixing the terms on which such track is to be used by the second company, made on their application to adjudge such terms, is not in the nature of an award, but the exercise of a power reserved by the city in granting the permission, and may be executed by ordinance without hearing or notice.

4. Where such ordinance fixes the terms, and declares that if the second company does not comply with them within a time prescribed, the first company should be released from the conditions and obligation of the ordinance of consent, those conditions and the contract to comply with them are discharged by the refusal of the second company to perform the terms prescribed, and the city cannot revive the contract.

5. The power reserved by such a contract in an ordinance is determined by its exercise: having been once performed, it is at an end.

6. The cars on a horse railroad have, when in motion, the right of way upon their own track, both as against those whom they meet and those who go in the same direction at a speed that would delay the cars.

7. The legislature, or the municipal government where the power is delegated to it, have the right to set apart a proper portion of a street for a street railroad, if such a road will accommodate the public travel for which the street was designed : and it makes no difference that the road is constructed and operated by an incorporated company for its own gain. The fare charged is, as in turnpike and plank roads built upon a public highway by legislative authority, only another way of keeping up and maintaining the highway.

8. The iron rails laid by a railroad company in a public street are the property of the company, and the use by another railroad company (authorized to lay a railroad of like character in the same direction for part of the route) of such rails, constantly or at regular intervals, is clearly an appropriation of such property, and unlawful.

VOL. V.                    F

Jersey City & Bergen R. Co. v. Jersey City & Hoboken Horse R. Co.

9. A railroad track is clearly private property, and cannot fairly be considered, in any just sense, devoted by the makers to public uses. No person, therefore, natural or corporate, can, at his mere will, appropriate the track of a horse railroad company to his own private use and convenience, by adapting his carriage to such use for that purpose.

10. A provision in an ordinance authorizing a railroad company to lay a track in the streets of a city, requiring, as a condition of such authority, that another railroad company should have the joint use of such track, upon compensation to be agreed on, was within the power of the common council; they had the right to require such condition. *Query.*—Whether the common council could have imposed, as a condition of their consent, that such joint use should be allowed without compensation.

11. Fraud or misrepresentation is not sufficient to avoid the act of a legislative body.

12. This court will not permit the property of one person or corporation to be taken by another, without compensation first paid. In almost every like case, compensation could be made in damages, yet equity always interferes by injunction, and does not permit the property to be taken and the party put to his action.

The argument was upon a rule to show cause why an injunction should not be granted to restrain the defendants from running their cars upon the tracks laid by the complainants in the streets of Jersey City.

*Mr. L. Zabriskie* and *Mr. I. W. Scudder*, for complainants.

*Mr. Dixon* and *Mr. Gilchrist*, for defendants.

The Chancellor.

The complainants and the defendant corporation, whom I shall call the defendants, are both authorized by their charters, granted by the legislature, to lay rails in the streets of Jersey City, upon obtaining the consent of the common council of the city; both had the right to build a horse railroad to the Jersey City ferry, at the foot of Montgomery street in that city, and both had the right, by consent of the common council, to lay their railroad tracks in the streets that lead to that ferry. These charters were both granted

in March, 1859, and each granted the right or franchise of running cars and carrying passengers over their road when two miles of it should be completed.

The mayor and common council of Jersey City, by an ordinance approved December 20th, 1859, gave their consent to the complainants to lay a single track in certain streets in Jersey City, including Montgomery street, from Hudson street to Newark avenue, Newark avenue to Grove street, thence through Grove street, Montgomery street, Gregory street, York street, and Hudson street, to the foot of Montgomery street. And in the third section of this ordinance it was enacted that the consent to lay said track in Montgomery street to Newark avenue, and in Grove, Gregory, and York streets, was upon condition that the Jersey City and Hoboken Horse Railroad Company should have the joint use of any tracks that should be laid in said streets by virtue of said consent; and that if any disagreement should arise between the said two companies as to the expense or manner of laying said tracks, or the use thereof, such disagreement should be finally adjudicated and settled by the common council of said city. Other sections of this ordinance directed with what kind of rail, and of what width, the track should be laid, and required the company to pave with Belgian pavement the space between the rails and for two feet outside of them, and to keep this pavement in repair. It also provided that the city might at any time remove the tracks to lay down or repair water-pipes, sewers, or gas-pipes, or alter the grade of the streets, and that the company should replace the track and pavement at their own cost, and might, in the meantime, lay temporary rails in such street as the city should designate. It also provided that the company should pay city taxes, although exempt by their charter, and should only charge five cents fare within the city. The ninth section provided that the ordinance should go into effect as soon as the company should, under their seal, agree that they would apply at the next session of the legislature and obtain, if possible, an amendment to their charter, so

that in obtaining the consent of the common council to lay their rails, they should be subject to such conditions as the common council may have, by ordinance, imposed upon them. This agreement was executed by the complainants on the day after the approval of the ordinance.

The legislature, by an act approved March 17th, 1860, provided that the complainants, *"in laying, repairing, and maintaining their rails, and in constructing their roads* in the streets of Jersey City, shall be subject to such conditions as the common council of said city, in the ordinance granting consent to lay such rails and construct said road, shall have imposed, or shall impose upon them."

The common council also, by an ordinance approved January 18th, 1860, gave consent for the Hoboken company to lay a single track of rails in certain streets in Jersey City, including Grove street and Jersey avenue, north of, and until their respective intersections with Newark avenue, but not including any street in which their consent had been given to the complainants for laying rails. The third section of this ordinance provided "that the Jersey City and Hoboken Horse Railroad Company shall have the joint use of the tracks of the Jersey City and Bergen Railroad Company to and from their tracks in Jersey avenue and Grove street to Hudson street, upon their agreement with said Jersey City and Bergen Railroad Company, in accordance with section three of the ordinance to authorize said company to lay their rails, approved December 20th, 1859."

The complainants, by virtue of the ordinance granting them consent, laid their tracks in Newark avenue, from Jersey avenue, crossing Grove street to Montgomery street, and along that street to Hudson street, also in Grove, Montgomery, Gregory, York, and Hudson streets to the foot of Montgomery street. These tracks were laid by them at their own expense, without any aid from the defendants. The defendants laid their tracks in Pavonia avenue and Grove street to Newark avenue, and then by virtue of a verbal agreement between them and the complainants, ran

their cars on the complainants' tracks to the foot of Montgomery street. The terms of this agreement were that the complainants might use the track of the defendants for an equal distance as compensation, and that either party could put an end to the agreement by one month's notice. The complainants, on the 23d day of March, 1868, gave a notice to the defendants by which this agreement was terminated on the 1st day of May, 1868.

The defendants, by a written application made shortly after the receipt of the notice, formally applied to the common council of Jersey City, to give them the use of the necessary tracks to enable them to run their cars to the Jersey City ferry, under the provision of the third section of the ordinance of December 20th, 1859, for a nominal consideration.

Upon this application a committee was appointed, and upon their report, the common council, by an ordinance, approved September 21st, 1868, directed that the defendants should pay to the complainants, for the use of their tracks, the sum of $300 a year for each car run upon such tracks; that said sum should be computed from the 1st of May then last past, and that payment should be made at that rate on the first of every month, and that the money due for the use of the track from the 1st of May to the 1st of September, should be paid immediately. The second section of the ordinance provided, if the defendants upon demand made, should refuse to pay to the complainants the compensation so provided, at the times and in the manner provided, that the defendants should thenceforth cease to use the tracks of the complainants, and the complainants should thenceforth be released from all conditions and obligations on account of the provisions of the third section of the ordinance, approved December 20th, 1859. The complainants on the 23d of September, 1868, demanded the money due of the defendants, who refused to pay it, and answered that they would relinquish the use of the complainants' tracks.

After this the defendants discontinued running their cars

F *

on the tracks of the complainants, until February 5th, 1869. The common council, by an ordinance, approved January 15th, 1869, amended the first section of the ordinance of September 21st, 1868, so that the rate required to be paid for each car should be $100 a year, and the payment should commence from January 1st, 1869, and be payable on the first of each month, and the amount from January 1st, 1869, be payable immediately. After this ordinance went into effect, the defendants commenced running their cars over the tracks of the complainants, from Jersey avenue and Grove street, to the foot of Montgomery street. It is this use that complainants seek to enjoin.

The defendants claim the right to run their cars upon the rails of the complainants, first, on the ground that these rails are laid in a public street, and that they, as part of the public, have a perfect right to travel and run cars any where in that street. It has been settled in this state, in the case of *Hinchman* v. *The Paterson Horse R. Co.*, 2 *C. E. Green* 75, that the laying a horse railroad track in a public street, is not taking the property of the owner of the soil for public use so as to entitle him to compensation anew; that when the laying of such rails is authorized by the legislature, "it is a legitimate use of the highway, and an exercise of the public right of travel, and not a taking of private property for public use within the provision of the constitution." This principle has been adopted and sanctioned in other states. *Brooklyn City R. Co.* v. *Coney Island R. Co.*, 35 *Barb.* 364; *Elliott* v. *Fairhaven & West. R. Co.*, 32 *Conn.* 579; *Cincinnati R. Co.* v. *Cumminsville*, 14 *Ohio State R.* 523. And the reasoning of Emott, J., in his opinion in *The People* v. *Kerr*, 27 *N. Y. R.* 207, and of Sutherland, J., in his opinion in *Wager* v. *The Troy Union R. Co.*, 25 *N. Y. R.* 537, support this doctrine, and distinguish between horse or street railroads and those operated by steam. Nor does the decision in this last case, which is upon a steam railroad, contravene it; although in that state, a contrary doctrine was held at the Monroe general Term, in *Craig* v.

*Rochester City R. Co.*, 39 *Barb*. 494. The defendants contend that this is so held, on the ground that the use of the street is in no degree taken from the public by a horse railroad track, and therefore they are entitled to use the rails or track laid down in the street, as the only way of exercising their right to use that part of the street.

In this state, it has been held that the land occupied by a public street cannot be taken even by authority of the legislature for a railroad operated by steam. *Starr* v. *Camden & Atl. R. Co.*, 4 *Zab*. 592; *Hetfield* v. *The Central R. Co. of N. J.*, in the Supreme Court, 5 *Dutcher* 206, and in the Court of Errors, *Ib*. 571. The right of the owner of the fee in a public street to compensation, was assumed by the judges in both courts. The courts of New York have recognized and established this as the law of that state. *Williams* v. *N. Y. Central R. Co.*, 16 *N. Y. R.* 97; *Mahan* v. *N. Y. Central R. Co.*, 24 *N. Y. R.* 658. Beside the authority of these cases, I think that the grounds upon which they are decided, and upon which the distinction is made between street railroads and those operated by steam, are sound and founded on well established legal principles.

When the land is taken and appropriated for an ordinary public highway, compensation must be paid to the owner, unless he consents that it shall be taken without compensation; such consent is generally given because he thinks that he will be recompensed by having the advantage of a highway along his land. In this state, such consent, in the rural districts, is shown by his signing an application for laying out the highway; and the estimate of his injury, and the compensation for his property when he does not consent, is made with regard to the benefit he may receive from the road. The like principle is observed in a different form, in laying out streets in most of the incorporated towns and cities; it is most equitable and just; and in all cases the whole or part of the compensation which the owner receives for his land is the advantage of a public street or highway along them. The great advantage of this is, the free access

it gives to his property for himself and all others who may do business with him, or desire to go to his premises. And in cities especially, the most valuable part of this access is that for persons in the same city, and from and to other establishments in the same city; persons passing through from all parts of the state or of the country have the right of free passage over the street or road which is opened, but this is of little if any benefit to the person whose land is taken; he has perhaps an equivalent in the like right to pass over all public roads in the state or country where he may travel. But the important compensation is free access of all to his premises, and free passage from them to the vicinity. Where lands are taken for a railroad operated by steam, the owner in front of whose house or premises the road passes, is not benefited by it, that is, by its passing in front of his lands; he may be, and in some instances is benefited by a depot in his vicinity, but that benefit is not by a road passing in front; he would receive the same benefit, and would be as near the depot if the road was located over his neighbor's land a hundred yards in the rear. The common highway for which his land was taken would not benefit him, if laid in his rear; the only advantage to be gained by it is, by having it along the front of his premises. When the road laid out in front is occupied by a steam railroad, so much of it as is taken for that purpose is of no use for the object for which the road was laid out; it cannot be used at all for access to his premises; and the part not occupied by the track, is by the passage of trains rendered useless to a great extent for travel with horses or ordinary carriages, and for children or persons not of careful habits to cross or travel upon.· It is apparent that the main value of such a highway for the purpose for which it was opened, and the land taken or given, is destroyed by a steam railroad being constructed and operated upon it. These roads do, or should in all cases, by fences or otherwise, prevent every one except their own trains from traveling on their tracks. In all these respects a street railroad differs from one operated by

steam ; as observed by the Chancellor, in *Hinchman* v. *The Paterson Horse Railroad Company*, the operation of such a road " is a legitimate use of the highway, and an exercise of the public right of travel." In general, the cars will stop in front of every door, and convey persons from any one point on their line to any other to which they may desire to go ; and the great use and advantage of them is to those whose property was taken for the street, and whose lands adjoin it. The courts must notice the fact that these street railroads have become an important and valuable institution in all our cities and towns, especially valuable to persons of small or moderate means. They are now almost indispensable ; and their chief value to the many consists in their being in the public streets, and along the shops and places of business ; if placed in the rear or at any distance from these streets, their value would be comparatively small. They are but a means of using the public streets to greater advantage for the very purposes for which they were laid out, free and quick transit from one part to another ; they are the best and cheapest mode yet devised ; and they do not hinder the use of the rest of the street for public travel, and hardly, and in a very small degree, obstruct the travel on the part occupied by the tracks, except the few inches covered by the iron rails. The cars exclude other vehicles from the space occupied by them when in motion—so do omnibuses and drays ; they have, when in motion, the right of way upon their own track, both as against those whom they meet, and those who go in the same direction ; a little more extended than the exclusive right of other vehicles, which have only the exclusive right to one side of the road as against those whom they meet, but it is in principle the same. For it must be taken for granted that the right to lay a track for horse cars, and to run them in a public street, gives the right of way as against all vehicles met, and against all traveling in the same direction, at a speed that would delay the cars, without any special legislation for the purpose. It is implied from the grant which would

be useless without it.   And it was so held by the Supreme Court in New York, in *Wilbrand* v. *The Eighth Av. R. Co.*, 3 *Bosw.* 314.

The legislature have the right, which is generally delegated to the municipal government, to regulate the manner in which a road or street shall be formed and used.   They can, and constantly do, appropriate a part for sidewalks, prohibit carriages from passing over them, and construct them so that carriages cannot be driven upon them.   Foot passengers are, in all cases, an important part of those who travel over the streets; and no government would discharge its duty that did not appropriate and secure to their use a sufficient part of the street; and if any citizen should be so wealthy and luxurious that he never used the street except in his carriage, he would have no right to complain that he was excluded from the sidewalk, or forbidden to drive upon it with his carriage, to the danger and annoyance of those on foot.   In the same manner, the state, or those to whom it has delegated the authority, has the right to set apart a proper portion of the street for a street railroad, if that road is to accommodate the public travel, for which the street was designed. The class to whom the roads are a convenience, and who can afford to ride in them, are as much entitled to protection and provision for their accommodation as those who walk, or who ride in carriages, or who carry merchandise; what portion each shall have depends upon circumstances to be considered and judged of by the municipal authorities, to whom the regulation of the streets is committed.   And it makes no difference that the road is constructed and operated by an incorporated company for their own gain.   The road is built for the use of the public, and the price charged is, or should be, limited to a compensation for the work done in transportation, and the cost of constructing and maintaining the road, and not for the right of way.   It is fair that to save the public from the expense of laying and maintaining this road, and expensive means of travel, that others should be allowed to construct it, and

charge the expense to those who use it; nothing can be more equitable. As has been held in the case of turnpike roads and plank roads, built upon a public highway by legislative authority, it is but another way of keeping up and maintaining the highway. *Wright* v. *Carter*, 3 *Dutcher* 76.

The question of the right to lay the rails for a horse railroad in the streets, is not directly raised in this case. But it is necessary to settle the principle upon which that right is maintained, for upon this must depend the right of others to use such rails in common with the owners of the railroad.

From this view it follows that the right of the legislature to authorize a street railroad to be laid in a highway, without further compensation to the owners of the soil, is not based upon the fact that the part of the street occupied by the rails is still open for general use, and that all can travel upon it as before, but upon the ground that such use of the street, like the use of a designated part for sidewalks, is the use of a part for the purposes for which the street was laid out, and for which the land was given or taken.

The iron rails laid by the complainants in the street are their property; although laid in the street, the property in them is not abandoned or given to the public, the city, or to the defendants, any more than stone steps, iron railing, posts, vault covers, or flagging, placed within the limits of the street by proper authority, are abandoned or given to the public. In most cases they could be removed by the owner, and in all cases he could maintain an action against any one injuring or appropriating them. No doubt the incidental crossing over those rails by any one in using the street, or even in the use of the street driving occasionally upon or along them, might be justified by an implied permission from their being placed in the street without any regulation to prohibit such use. But no one would be allowed to have a carriage constructed especially to pass over this track, and adapted to no other part of the street, and by it to appropriate the complainants' property to his own use.

In the case of a company authorized to lay a railroad of

like character, in the same direction, for part of its route, and in some respects a competing road (as that of the defendants is in this case), the use of the track of the complainants for their cars constantly, or at regular intervals, for their whole business, is clearly a taking or appropriation of the property to their own use. No reasoning can make this clearer than the mere statement, of itself. This view has been adopted by the courts of New York in a number of cases. *The Brooklyn Central R. Co.* v. *The Brooklyn City R. Co.*, 32 *Barb.* 358; *In re Kerr*, 42 *Barb* 119; *The Sixth Avenue R. Co.* v. *Kerr*, 45 *Barb.* 138. It was also, after consideration, approved and adopted by Judge Redfield, in his late treatise on the *Law of Railways, Vol.* 1, *p.* 541, § 6. He also adopted it in a report made by him in January, 1865, to the legislature of Massachusetts, by whom he had been appointed a commissioner to report to them his views of the law. 1 *Redfield on Railways*, 321 § 13, and 646, § 2. And, again, in a report made in the case of The Broadway Railroad Company *v.* The Metropolitan Railway Company, referred to him by the Supreme Court of Massachusetts. 1 *Redfield on Railways* 638. That report says : " We had no doubt the company building the track must be regarded as having a property in it ; and although it may not be a matter altogether free from embarrassment to give a satisfactory definition of the precise nature of the rights and interests of such company in their track in all respects, it is nevertheless clear to the minds of the commissioners, from the decisions already made in this commonwealth, and in other states, that such track must be regarded in the nature of private property, and that it cannot be fairly considered in any just sense devoted by the makers to public uses. Hence we do not understand that it is competent for any person, natural or corporate, at his mere will, to appropriate the track of a horse railway company to his own private use and convenience, by adapting his carriage to such use for that purpose." In this view of the law I entirely acquiesce, and am willing to adopt it as the law of this state. No railroad company could put

down a track if any other company or individual had a right to place cars on it, and use it for a competing traffic with the company who laid it. The principle would be destructive to all street railroads, and to the defendants themselves. In fact, the position was with great frankness abandoned by the counsel who closed the argument for the defendants. But its importance, and the fact that it has been frequently set up in such cases, seemed to me to require the consideration which I have given to it.

The defendants further place their right to run their cars upon the tracks of the complainants, upon the provisions in the ordinance of December 20th, 1859, and of the act of March 17th, 1860. The third section of the ordinance provides for the joint use by the defendants as a condition of the consent. The common council may not have had the right, in granting consent, to impose conditions affecting franchises granted to the complainants by their charter; as to prescribe their rates of fare, their manner of running their cars, or to require that the taxes, which the charter reserved to the state, should be paid to the city. The only thing for which their consent was required was the laying of the rails in any particular street, and the only condition which they could impose was as to the manner of laying and maintaining the rails, and to protect the street from unnecessary tracks. This they were authorized to do. It was their duty, as the guardians of the streets of the city, to provide that they should be kept in good and proper condition, so that others could travel in safety ; to provide that the parts which would be disturbed by laying the track should be re-laid and kept in order by the company, so that the tax-payers should be put to no expense. As two companies were applying for consent to lay a track from Pavonia avenue to the ferry, which must be in the same street, if the common council were of opinion that consent for two tracks could not be granted with due regard to public convenience, and that both lines were needed, they had a perfect right to require that both should have but one track. I consider this condi-

tion in the third section, as well as the regulation of the width of track, the kind of rail, and the manner of laying the track, to be such as the common council had the right to require. The acceptance of the ordinance by the complainants, the obligation to procure an amendment to the charter, and the amendment itself, confirm this view, and give validity to the conditions imposed upon the complainants.

But this ordinance, its acceptance, the obligation, and the supplement to the charter, are matters between the city and the complainants; as between them, they amount to contracts. But the defendants have no right under them; they constitute no contract either of the complainants or the common council, with the defendants. The city could repeal the ordinance, and the legislature the supplement, without regard to the defendants. The only contract with them, or matter approaching to a contract, was that contained in the third section of the ordinance of January 18th, 1860, granting them consent to lay rails. This authorizes them to have the joint use of the tracks of the complainants in question here, "upon their agreement" with the complainants, in accordance with the third section of their ordinance. That agreement was not made; and if made was only temporary, and was annulled, and is admitted not to exist. There is, therefore, no agreement, and the defendants have no right under that ordinance.

The only right being that given by the ordinance consenting to complainants' track, it could be extinguished by a repeal of that ordinance, or by a release of the right by the common council; and when the ordinance should be repealed, or the complainants released from the obligation, it could not be revived without their consent. It is doubtful whether the common council could have imposed, as a condition to their consent, that the defendants should be allowed to use the complainants' track without compensation; that would have have been a mere boon to the defendants, and not aimed at preserving the streets from unnecessary encumbrance. But they did not do this; they provided for the joint use upon

the defendants paying their share of the expense. This is the fair construction of the ordinance. They further provided that in case of disagreement as to the expense or use, it should be finally determined by the common council. The defendants and complainants did not agree, and the defendants appealed to the common council to allow them to use the complainants' tracks, upon a nominal compensation. This compensation the common council, by their ordinance of September 21st, 1868, fixed at the rate of $300 a year for each car, and provided that if the defendants should refuse to pay it on demand, the complainants should be released from the obligation to permit the joint use of their tracks.

It is objected that this determination was in the nature of an arbitration between the parties, and that it is void, because the defendants did not appear and were not heard; because it was the act of the mayor and common council and not of the common council only; and because the common council had no power to declare a forfeiture of the rights of the defendants.

But this was not an arbitration, or in the nature of it. The defendants had no right of franchise or property, no right by contract. The common council, as between themselves and the complainants, had reserved the right of joint use by the defendants; and had reserved to themselves, as against the complainants, the right to settle the amount of the expense. They could have settled it by fixing a gross sum; they chose to do it by directing it to be paid in a manner more equitable, if rightly adjusted, in proportion to the use. It could hardly be maintained even if this were an arbitration, that the defendants did not appear; the proceedings were begun at their request, and continued from time to time in the usual way of continuances in such a body. And were this an arbitration, it would not avoid it that the mayor, after the determination, approved of it by signing the ordinance. Had he, or any one in such case, interfered with or participated in the deliberations of the arbitrators, it might have affected the determination. But

an approval after the matter was finally and conclusively decided by the common council, cannot avoid their determination.

It is alleged that the determination of the common council was procured by fraud and misrepresentation. Fraud or misrepresentation is not sufficient to avoid the act of a legislative body, even if proved. This was clearly intimated by Chief Justice Marshall, in the Supreme Court of the United States, in the case of *Fletcher* v. *Peck,* 6 *Cranch* 87. And many acts of municipal or state legislation would be invalid if any material misrepresentation or fraud in procuring them would invalidate them. Even an award could not be set aside when drawn in question, collaterally, for misrepresentation or fraud in procuring it, but only in proceedings for the purpose of setting it aside. The fraud alleged in this case is in representations made on part of complainants to the committee of the common council, that the cost of their tracks used by the defendants was $40,000, when in fact they only cost $27,000. The fact of the representation is proved; and that the original cost of these tracks was only $27,000, is shown by the contractor. But that cost was in 1860, or 1861; and it no where appears that no additional expense beyond repairs, and properly constituting the cost of the road, has not been incurred. Such expense may have been incurred in many ways. If the grade of any of the streets had since been changed, it would have caused great expense. The ordinance provides for the removal of the track at the expense of the company, in case a sewer or water pipes are constructed or laid, and for the laying of a new track for a temporary purpose. For aught that appears such work may have been since done along the greater part of the line of these tracks, and may have occasioned large expense. It no where sufficiently appears that the representation was false.

This was a valid ordinance, and its effect was, as it was expressly declared on its face, to release the complainants from the burden of a joint use of their track by the defendants. The whole subject matter was within the power of

MAY TERM, 1869. 77

Jersey City & Bergen R. Co. v. Jersey City & Hoboken Horse R. Co.

the common council, and they could and did release the complainants. Having done this, it was beyond the power of the common council to retract and avoid the effect of this release, by the ordinance of January 15th, 1869. The defendants had refused to abide by the determination and pay the sum directed, had elected to abandon the use of the tracks, and had in fact abandoned it for months. In this situation it was beyond the power of the common council to revive the right. They could not do it by a new ordinance, nor by the awkwardly executed device of amending the former ordinance. It was not like the requirement in the first ordinance, a condition of granting the consent; it was not authorized by the act of 1860, which only gave validity to conditions imposed in the ordinance granting consent.

It is contended on part of the defendants, that the act of 1860, which gave validity to the conditions in the ordinance, by its operation fastened these conditions to the complainants as part of their charter, and that the common council have no power to release them. There is a serious doubt whether the second section of the act of 1860, applies to the joint use of the tracks by the defendants. The words are, that the Jersey City and Bergen Railroad Company *in laying, repairing, and maintaining their rails* and *constructing their roads*, shall be subject to such conditions as may be imposed by the common council. This section only applies to the laying of the rails, and constructing the road, and repairing and maintaining them. The act expressly limits the restriction to these enumerated particulars. There are provisions in the ordinance as to laying, repairing, and maintaining the rails, and constructing the road, to which these terms most appropriately apply, and it would be unnecessarily straining the words beyond their natural meaning, to make them apply to the use of the tracks by others, or the rate of fares, or the payment of taxes, which are also provided for in the ordinance. These provisions derive their force from the acceptance of the ordinance, and the obligation required and entered into; and there is no reason

G *

for giving these words any meaning here beyond their usual and natural meaning.

But if the act is held to include the joint use of the track, its only effect is to give validity to the ordinance as an ordinance, and to give to the common council authority to exact the conditions imposed by it. It was for the relief of the common council, not to take away or limit their power, and having given this effect to the ordinance it left it like all other ordinances subject to repeal or modification by the common council; and when they, by the ordinance of 1868, released the complainants from, and in effect repealed, the third section of the ordinance of 1859, the act was of no efficacy to give validity to the conditions so repealed—the conditions were no longer conditions imposed by the ordinance.

The determination of the common council as to the expense, when once made, is final and cannot be reconsidered or changed; having performed the duty or power which devolved upon them, like commissioners to assess damages, surveyors of highways, arbitrators, and similar tribunals for a special purpose, they are *functi officio*, and their power is extinct. The defendants refused to pay, and have not paid the expense or compensation required, and are not entitled to use the complainants' property without compensation.

This is a proper case for this court to interfere by injunction. It is the settled doctrine of the court, to prevent the property of one person or corporation from being taken by another, for public or any use without compensation first paid. In almost every case of this kind, compensation could be made in damages recoverable in an action at law, and experience shows that juries do not generally give inadequate damages; yet this court always interferes by injunction, and does not permit property to be taken and the party put to his action.

For these reasons, the injunction applied for must be granted.