JAMES HODGES, and others *vs.* THE BALTIMORE UNION PASSENGER RAILWAY COMPANY, and others.

*Legislative power—Horse railways—Servitude—Ground of the Right to use the Streets of a city for a Horse railway—Power of the Legislature to amend by Special Act the charters of Corporations created under the General Corporation law—Act of 1831, ch. 252—Act of 1882, ch. 47, not in conflict with sec. 33, of Art. 3, of the Constitution—Mode of taking advantage of an act of Forfeiture—Waiver of act of Forfeiture—Act of 1828, ch. 135—Validity of the Act of 1882, ch. 47—Insufficient ground for an Injunction against the Baltimore Union Passenger Railway Company.*

The Legislature in the exercise of its sovereign powers may authorize the use of the streets of a city or town for the purposes of a horse-railway, and such a use is not an additional servitude for which adjoining lot owners are entitled to compensation.

The right to use the streets of a city for a horse-railway, rests on the ground that such a use is neither inconsistent with, nor does it in any manner supersede, the ordinary uses for which the street was dedicated as a highway—that the easement thereby acquired was the right to use the streets not only according to the then existing modes of travel and transportation, but all such other modes as might arise in the ordinary course of improvement; and that a horse-railway is but one of the legitimate contingencies within the object and purpose for which the street was dedicated to the public, and which, it is, therefore, to be presumed, was within the contemplation of the parties at the time damages were assessed to abutting owners.

The Constitution of the State does not require that amendments to the charters of corporations created under the general corporation laws of the State, should be made by general laws operating alike on all corporations. The Legislature has the unquestioned power to amend such charters by special Act.

The Act of 1831, ch. 252, which authorizes the Mayor and City Council of Baltimore, on the application of a majority of lot

604      MARYLAND REPORTS.

Hodges, *et al. vs.* Balto. Passenger Railway Co., *et al.*

owners fronting on any street, to pass such Ordinances as may be necessary for the construction of railway tracks, &c., has no application or reference whatever to horse railways for passengers.

There being no *general* law of the State conferring the right, and prescribing the terms and conditions on which the Baltimore Union Passenger Railway Company was to construct and operate its railway on certain streets in the City of Baltimore, the Act of 1882, ch. 47, ratifying Ordinance No. 150, and authorizing said Railway Company to operate its railways on such streets, and on such conditions as the Mayor and City Council of Baltimore may prescribe, is not in conflict with sec. 33, of Art. 3, of the Constitution, which provides that "the General Assembly shall pass no special law for any case, for which provision has been made by an existing general law."

The failure of the Baltimore Union Passenger Railway Company to begin the work of constructing its railway tracks within the time prescribed by Ordinance No. 150, cannot be taken advantage of, or enforced collaterally or incidentally, as a ground of forfeiture of the rights of the company; it can only be availed of by a direct proceeding for that purpose against the company.

The requirement in Ordinance No. 150, that the Baltimore Union Passenger Railway Company, should commence the work of laying down and constructing its tracks within a prescribed time, was a provision intended for the benefit of the City of Baltimore, and one which its authorities might waive at pleasure.

The Act of 1828, ch. 135, under which Park street in the City of Baltimore was opened, does not limit the authority of the city or of the Legislature over the street: Under the provisions of that Act, it became a public highway, and as such is subject precisely to the same uses as any other street.

The Act of 1882, ch. 47, authorizing the Baltimore Union Passenger Railway Company, incorporated under the Act of 1876, ch. 242, to construct and operate passenger railways upon certain streets in the City of Baltimore, being a valid Act, the use of Park avenue for that purpose, is not such an invasion of the rights of the owners of property fronting or abutting on said avenue, between Franklin and Madison streets, as to entitle them to enjoin such proceeding.

Hodges, *et al. vs.* Balto. Passenger Railway Co., *et al.*

APPEAL from the Circuit Court of Baltimore City.

The bill in this case was filed by nineteen owners of property fronting or abutting or Park avenue, between Franklin and Madison streets, to enjoin the laying down of railway tracks by the respondent corporation and the other three respondents, who are respectively its president, superintendent and contractor. The Court, upon the filing of the bill, laid a rule upon the respondents, requiring them to show cause why a preliminary injunction should not issue as prayed; the respondents having all answered by the day named in the order, the complainants filed the general replication, and a commission issued by consent, under which a considerable amount of testimony was taken. After a full hearing upon the bill, answers, exhibits, general replication and proof, the rule to show cause laid upon the respondents was discharged, and the injunction refused. From this action of the Court this appeal is taken.

The cause was argued before BARTOL, C. J., STONE, ROBINSON, IRVING and RITCHIE, J.

*Charles J. Bonaparte,* and *Severn Teackle Wallis,* for the appellants.

An unauthorized passenger horse railway in a public street is *per se* an obstruction to the highway and a nuisance, and will be enjoined at the suit of abutting property owners. *Redfield on Railways (5th Ed.)* 318, *note; Milhau vs. Sharp,* 27 *N. Y.,* 611; *Imlay vs. U. Br. Ry. Co.,* 26 *Conn.,* 249; *B. & O. R. R. Co. vs. Strauss,* 37 *Md.,* 237; *Roman vs. Strauss,* 10 *Md.,* 89; *West. Md. R. R. Co. vs. Owings,* 15 *Md.,* 199.

This railway, if authorized at all, is so by Ordinance No. 150 of 1880, of the Mayor and City Council of Baltimore; or, the Special Act of Assembly, 1882, ch. 47; or, the provisions of the Act of 1876, ch. 242, under which the Company was incorporated.

If it shall be shown that no one of these separately, nor yet all of them considered together, authorized its construction, then it is a necessary corollary of our first position, that the complainants should have had the preliminary injunction prayed for in their bill.

The Ordinance does not authorize the railway, because—

1. It is wholly invalid, and a nullity, being in excess of the city's corporate powers.

2. Whatever rights it conferred, if it had conferred any, were forfeited by the failure of the persons named in it to comply with the express terms of *section eleven.*

1. The city of Baltimore has no greater powers over its streets than are conferred upon it by the statutes of this State. These are to condemn and open streets. (*City Code* 1879, *Article* 47, *sections* 1, 2, 3.) To pave and grade streets (*Article* 47, *sections* 4, 5, 6;) to provide for their drainage by sewers (*Article* 44,) and to clean and light them (*Article* 47, *section* 14.)

Railroads in streets can be authorized by the Mayor and City Council only under the provisions and with regard to the terms of the Act of 1831, ch. 252. (*Public Local Laws, Art.* 4, *sec.* 856; *City Code* 1879, *Art.* 40, "*Statute.*")

That this Act furnishes the only authority to the Mayor and City Council to construct, or to authorize other persons to construct, railways in the streets, is obvious, from a comparison of the analogous provisions regarding the paving and grading of streets, contained in section 6, Article 47, "Statutes," City Code 1879, which had to be supplemented by a further special authority to pave and grade streets without the assent of owners of a majority of front feet binding thereon, conferred by section 5 of the same Article (*Act* 1874, *ch.* 218, *sec.* 1,) to enable the city corporation to dispense with the assent of such owners.

No analogous enactment having qualified the provisions of the Act of 1831, that Act furnishes the only

authority possessed by the city in regard to street railroads, and an Ordinance for this purpose, not complying with its terms, is wholly void. *Roberts vs. Easton, et al.,* 19 *Ohio St.,* 78; *Mayor & C. C. of Baltimore vs. Eschbach,* 18 *Md.,* 276. The question is equally clear if regarded in another light. The laying of railroad tracks upon a public street involves the exercise of the power of *eminent domain. Act of* 1876, *ch.* 242, *sec.* 13; *Douglass vs. Boonsborough Turnpike Co.,* 22 *Md.,* 219, 238.

This power *may* be delegated to a municipal corporation, but it does not exist in such a corporation from its nature, and without express delegation by the State; and it has, in fact, been conferred upon the Mayor and City Council for certain specified purposes only, which purposes do not include those of constructing or operating street or other railways.

If this Ordinance is beyond the corporate powers of the city, it is absolutely a nullity and void. *Horn vs. Mayor & C. C. of Balto.,* 30 *Md.,* 218; *City Code* 1879, *pages* 7 *and* 8, *notes; State vs. Mayor, &c.,* 3 *Duer* (*N. Y.,*) 119; *Memphis City R. R. Co. vs. Memphis,* 4 *Coldw.,* (*Tenn.*) 406; *Atlantic & Pacific R. R. Co. vs. St. Louis,* 66 *Mo.,* 228; *Perry vs. N. O. &c. R. R. Co.,* 55 *Ala.,* 413; *State vs. Trenton,* 36 *N. J. L.,* 79; *Chicago vs. Rumpff,* 45 *Ill.,* 90; *Tugman vs. Chicago,* 78 *Ill.,* 405; *Logan vs. Pyne,* 43 *Iowa,* 524; *Ill. &c. R. R. Co. vs. St. Louis,* 2 *Dill.* (*U. S. C. C.,*) 70; *Gale vs. Kalamazoo,* 23 *Mich.,* 344.

It is true that by the provisions of Article 41, of the Revised Code, the Mayor and City Council may *assent* to the use of the public streets for railway purposes by corporations already possessing, under the provisions of that Act, the power of *eminent domain* by express delegation from the State, but this cannot certainly be construed into authority to *confer* similar privileges upon persons, whether natural, or corporate, not so endowed with such rights.

Indeed this would virtually be permitting the Mayor and City Council to create a corporation, which is clearly and indisputably beyond their power.

2. It is clearly shown by the testimony, that nothing was done by the five persons named in section 1 of the Ordinance, nor yet by the nine persons named in "defendants' Exhibits 2 and 3;" nor yet by the five persons named as incorporators in "defendants' Exhibit 1;" nor finally, by the respondent corporation itself, to commence "the work of laying down and constructing the railway track," mentioned in *section eleven* of the Ordinance, until the end of February, or beginning of March, of the present year.

The failure to comply with the terms of *section eleven,* wholly nullified the Ordinance without any proceeding or action by the State or city. *Oakland Ry. Co. vs. O. B. & F. V. Ry. Co.,* 45 *Cal.,* 365; *N. Y. H. & N. H. Ry. Co. vs. B. H. & E. Ry. Co.,* 36 *Conn.,* 196; *In re B. W. & N. Ry. Co.,* 72 *N. Y.,* 245; *Brooklyn Stm. Trans. Co. vs. Brooklyn,* 78 *N. Y.,* 523; *Perry vs. Calais Ry. Co.,* 30 *Maine,* 498; *U. & M. Ry. Co. vs. S. C. & St. P. Ry. Co.,* 49 *Iowa,* 604; *Parmalee vs. S. & O. Ry. Co.,* 7 *Barbour,* 599.

Indeed, the interruption in the exercise of their privileges by these respondents was so unreasonably long, as of itself to amount to an abandonment of them, even if there had been no express limitation of time. *G. C. R. Ry. Co. vs. 13th & 15th Sts. Ry. Co.,* 7 *Philadelphia,* 620; *Hayden vs. Stoughton,* 5 *Pickering,* 528, 535; *Wells vs. Smith,* 7 *Paige (N. Y.,)* 22; *Hamilton vs. N. Y. & N. H. Ry. Co.,* 9 *Paige (N. Y.,)* 171.

The special Act of Assembly (Act of 1882, ch. 47) does not authorize this railway, because,

1. The first section of this Act is plainly unconstitutional and a nullity. It violates distinctly the prescriptions of section 33, of Article 3, of the Constitution of this

Hodges, *et al. vs.* Balto. Passenger Railway Co., *et al.*

State, of 1867, which says: "the General Assembly shall pass no special law for any case for which provision has been made by an existing general law."

Full provision for the use of the streets of Baltimore city by railroad companies had been made by section 13, of chapter 242, of the Acts of 1876, at the time this Act was passed, and this "general law" covered the case of horse as well as steam railways, and regulated their rights and duties with respect to the streets of the city. *Oler vs. Balto. & Randallstown Railway Company*, 41 *Md.*, 583. A clearer case of the violation of this constitutional provision could scarcely be found. *State, ex rel. Webster vs. County Coms. of Balto. Co.*, 30 *Md.*, 516, 520, 521; *Rockhill College vs. Jones, et al., Adms.*, 47 *Md.*, 1, 16; *Pumphrey vs. Mayor, &c. of Baltimore*, 47 *Md.*, 145, 153; *McGrath vs. State, &c.*, 46 *Md.*, 631, 634; *Montague, Excr., vs. State, &c.*, 54 *Md.*, 481, 489, 490.

Moreover, the Act in question violates the spirit, and also the letter of section 48 of Article 3, of the Constitution of 1867, for it seems too plain for argument that the effect of this statute was to confer on the respondent corporation corporate rights different from what it could acquire under the general railroad law.

It would be a mere evasion of this provision if the formation of a corporation, under the general law which could not be formed by special Act, would authorize the Legislature to confer upon it new and different powers. *New Central Coal Co. vs. George's Creek Co.*, 37 *Md.*, 537, 557, 558; *Montell vs. Consolidation Coal Co.*, 39 *Md.*, 164, 170, 171. These views are sustained by a decision upon a precisely analogous case in New York, *In re B. W. & N. R. R. Co.*, 75 *N. Y.*, 335; and by the construction put upon similar prohibitions in other State Constitutions. *San Francisco vs. S. V. Water Works*, 48 *Cal.*, 510, 511; *O. & V. R. R. Co. vs. Plumas Co.*, 37 *Cal.*, 362, 363; *Atkinson vs. M. & C. Ry. Co.*, 15 *Ohio St.*, 38, 39; *City of* .

*Wyandotte vs. Wood,* 5 *Kansas,* 606, 607; *State vs. Cincinnati,* 20 *Ohio Stat.,* 24, 25; *Ex parte Pritsch,* 9 *Iowa,* 32, 33; *Frye vs. Partridge,* 82 *Ill.,* 266, 273, 274; *Devine vs. Cook Co.,* 84 *Ill.,* 590; *People vs. Allen,* 42 *N. Y.,* 378, 381; *People vs. Chatauqua Co.,* 43 *N. Y.,* 10; *Pell vs. Newark,* 11 *Vroom,* (*N. J.,*) 550.

2. Even if the Act in question were constitutional, it conferred upon the respondent corporation no right to construct this railway.

The intention of the Legislature was neither to ratify an invalid Ordinance, nor to waive any forfeiture of the rights it might have conferred, nor yet to divest the original grantees of the rights supposed to have been conferred by that Ordinance, and transfer them to the respondent corporation; but the Act was passed in the belief that Ordinance No. 150 (of 1880) was valid; that the rights it conferred had not been forfeited, and that these rights were then validly vested in the Baltimore Union Passenger Railway Company.

If this Ordinance were invalid; if the rights it proposed to confer had been lost, or if those rights were still legally vested in persons other than the corporation named in the Act, these defects in the authority of that corporation to build its road could not be removed by the Act in question, or "by any Acts or series of supplements passed upon the assumption" that they did not exist; "all such Acts, instead of possessing any curative powers, merely multiply errors." *State, ex rel. Mayor, &c., of Baltimore vs. Kirkley, et al.,* 29 *Md.,* 85, 109.

The intention of the Legislature "must be * * * collected from the nature of the application made to them, and the terms they have used in granting it."

In the application for the passage of this Act, as indicated by its preamble, there is no trace that any one was aware of the insufficiency of the corporation's rights under the Ordinance, or "the slightest intimation of a wish for

the passage of a law curing such defects." *Dulaney vs. Tilghman*, 6 *G. & J.*, 461, 473, 474.

On the contrary, the preamble expressly states that the corporation "has duly become vested with all the rights and franchises" granted by the Ordinance. See *Atkinson vs. M. & C. R. R. Co.*, 15 *Ohio State*, 38, 39.

Moreover, giving to the Act every possible effect which can be claimed for it, still it requires further action by the Mayor and City Council. It authorizes the railways to be constructed and operated "upon such conditions as may be prescribed by said Mayor and City Council of Baltimore." When these conditions have been prescribed by the city and complied with by the company, it may be material to discuss its rights under the Act.

If it be said that Ordinance No. 150, of 1880, prescribes the conditions, the answer is, that they were not prescribed to this corporation, and have not been complied with by any one.

"Every conceivable purpose of the Legislature, so far as it appears from the face of the statute, is gratified by construing this Act as an independent grant of power, to be exercised by future legislation on the part of the city corporation." 29 *Md.*, 106; compare *Northern Central Railway Co. vs. Mayor, &c., of Baltimore*, 21 *Md.*, 93.

The general railroad law of the State (Revised Code, Article 41,) does not authorize the construction of this railway.

Because (if for no other reason) by section 12, it is "provided that no railroad company shall be allowed to pass through the city of Baltimore without the consent of the municipal authorities," and the municipal authorities are not shown or even claimed to have consented to the passage of *this company* through the streets. Indeed, since the Act of 1876 (a general law,) must be construed with regard and in subordination to the provisions of the Act of 1831, (a subsisting local law,) effect can be given

to the two laws read together only by considering the assent of the owners of a majority of abutting front feet as a prerequisite to the passage of a railway through the streets. Independently, therefore, of any special rights of these complainants, the construction of this railway is unauthorized and a nuisance.

*E. J. D. Cross*, and *John K. Cowen*, for the appellees.

The city of Baltimore has the right to regulate the manner in which the streets of the city shall be used, and to provide for the laying of street railway tracks in the same, and has this right under the general powers which are conferred upon it, as found in the City Code, together with the supplementary Act of 1880, ch. 69.

It is now well settled in this State, that the use of a street for street railway purposes is not the imposition of a new servitude, but is only an improved use of the highway. *Peddicord's Case*, 34 *Md.*, 479, and *Hiss vs. The Baltimore and Hampden Railway Company*, 52 *Md.*, 242.

In the latter case the Court of Appeals expressly approves the position taken by Judge Cooley in his work on Constitutional Limitations, that " When land is taken or dedicated for a town street, it is unquestionably appropriated for all the ordinary purposes of a town street, not merely the purposes to which such streets were formerly applied, but those demanded by new improvements and new wants. Among these purposes is the use for carriages which run upon a grooved track, and the appropriation of an improved street in large cities for their use is not only a frequent necessity which must be supposed to have been contemplated, but is almost as much a matter of course as the grading and paving. "

We believe the doctrine is now settled, by the preponderance of authority, that although a municipal corporation may not have the express authority granted by the Legislature to authorize street railway tracks in the

streets, yet "the ordinary powers of municipal corporations' are usually ample enough, in the absence of express legislation on the subject, to authorize them to permit the use of streets within their limits, for such purposes." 2 *Dillon on Municipal Corporations, secs.* 575, 724; *Milburn vs. Cedar Rapids,* 12 *Iowa,* 246; *Cook vs. City of Burlington,* 36 *Iowa,* 357; *Lexington, &c. Railroad vs. Applegate,* 8 *Dana,* (*Ky.,*) 289; *Moses vs. Railroad Company,* 21 *Ill.,* 522; *Murphy vs. City of Chicago,* 29 *Ill.,* 279; *Brown vs. Duplessis,* 14 *La. Annual,* 842.

The Legislature has delegated to the municipality the power to regulate and control the use of its highways, and the vehicles run thereon. The municipality grants to certain individuals the right to run over those streets with a carriage or vehicle which runs on iron rails, so laid that they may form a part of the bed of the street, and do not obstruct the use of it as a highway by the rest of the public. What is there to prevent the city granting the right to lay such tracks for such vehicles? Why is this not a proper regulation of the highway and the carriages used thereon? Suppose the municipality should grant to these individuals the right to lay a plank road over the highway, so as to run thereon their vehicles more readily; could not these individuals, at their own expense and under the authority of the city, make such an improvement of the public streets? Would the city need any further power than it already possesses by virtue of its general authority over the streets, to authorize such an improvement? Such a grant is simply an authority to individuals, at their own cost, to improve the highway for certain purposes. The grant to put down a horse railway in a public street is simply an authority to make a certain portion of the bed of the streets of a particular substance—iron—and thus fit that street for the use of a certain class of carriages for public convenience. Is it not competent for the city to authorize individuals who wish to run omnibus lines to

make an improved way for their vehicles? Could not the city authorize an express company to lay down iron rails in the street, for the purpose of running their heavy wagons thereon, when this did, in no manner, prevent the use of the street by the general public for all lawful purposes? Has not this Court decided that the use of a street for horse railways is not an additional servitude, but is such a use as was contemplated when the same was either dedicated to the public or condemned· by the municipal authorities? Does laying grooved tracks for carriages which can only run on such tracks differ in principle from laying stone pavements for such carriages as can best run on such pavements?

But it is hardly worth while to discuss the question of the implied power of the city, to authorize individuals to lay down street railway tracks on the streets of Baltimore, and, therefore, to pass Ordinance No. 150, the subject of inquiry in this case; because the city authorities certainly have the power to grant to a railroad company, organized under the Act of 1876, ch. 242, the right to lay railroad tracks in the streets of the city. (Section 12, of Article 41, Revised Code.)

Therefore, even if the grant to the individuals named in the Ordinance could not be made effective, yet the grant to those individuals when they became incorporated would be perfectly valid under section 4 of the Ordinance. The city of Baltimore certainly has the right to pass an Ordinance authorizing any railway company, organized after the date of the Ordinance, to occupy streets designated therein, upon the terms thereby prescribed. It is not necessary·that a railway company be in existence at the time of the passage of an Ordinance, in order to accept the benefits of the same. A grant, therefore, to individuals when they become a corporation, is perfectly valid. When the individuals named in Ordinance No. 150 became incorporated, they became entitled to the

rights granted by the Ordinance, as fully as if they had been incorporated before the passage of the Ordinance, and the grant had been made directly to the incorporated company.

There has been a legislative ratification of Ordinance No. 150, by express reference to the same in the special Act of Assembly (Act of 1882, ch. 47,) enlarging the powers of the Baltimore Union Passenger Railway Company. *Baltimore and Potomac Railroad Company vs. Reaney*, 42 *Md.*, 131.

It is asserted by the appellants' counsel, that the special Act of Assembly relating to the Baltimore Union Passenger Railway Company is unconstitutional.

*First.* Because that company having been chartered under the general railroad law, its charter cannot be amended or modified by a special Act. Section 48, of Article 3, of the Constitution, is relied on to support this proposition. The contention of appellants' counsel is that this section prevents the General Assembly from amending by special Act, the charter of a corporation organized under a general law; and that there can be no enlargement or limitation of the powers of such corporation by special Act of the Legislature. It is difficult to perceive what language there is in this section of the Constitution, which even suggests such a construction. This provision of the Maryland Constitution does not prohibit the grant of corporate powers by a special Act, as does the Constitution of Ohio and the other States— the decisions of whose Courts are cited by appellants. Railroad corporations were all created by special Act prior to the general railroad law of 1870.

The prohibition of the Maryland Constitution is against the "formation—" the "creation" of corporations by special Act, except "in cases where no general laws exist, providing for the *creation* of corporations of the same general character as the corporation proposed to

be *created."* The special Act in question does not purport to *create* or *form* a corporation. It only amends and enlarges the powers of an existing corporation.

The defendant took out its charter under the general law, and by the express provision of the Constitution, this charter could be amended or altered by the Legislature. Amended, how? Only by an amendment to the general law, the appellants' counsel answer, giving to all companies as organized thereunder the same powers. The Constitution does not say that the charter can only be altered or amended by a general law; there is not a syllable or line which can be construed to have such a meaning. The charters "granted or adopted in pursuance of this section, and all charters heretofore granted and created subject to modification and repeal, may be altered from *time to time* or repealed."

A special Act incorporating a company, prior to the Constitution of 1867, and which was subject to repeal or modification, "may be altered from time to time or repealed." Must such a special Act be altered by a general law?

A charter granted in pursuance of the Constitution of 1867 and prior special charters subject to modification, "may be altered from time to time." The two classes of charters are both made subject to the same power of alteration, and it is not possible to say that the mode of amending one is different from the manner of amending the other.

An examination of the Acts of the General Assembly since 1867, will show that numerous special Acts have been passed enlarging the powers of corporations created under general laws, thus showing the general view not only of the Legislature, but of the profession, as to the right of the General Assembly to enact special laws amending such charters. The following are a few of the many special Acts upon the Statute Books: 1872, ch. 126;

1874, ch. 291; 1874, ch. 299; 1874, ch. 340; 1874, ch. 481; 1876, ch. 83; 1878, ch. 222; 1878, ch. 442; 1880, ch. 338; 1880, ch. 467.

*Second.* The appellants contend that this special Act is in violation of section 33, of Article 3 of the Constitution, which provides that "The General Assembly shall pass no special law for any case for which provision has been made by an existing general law." The general law either provides for this case or it does not; if it does, then the grant directly to this company of all the privileges conferred by the Ordinance is valid; if, however, the "existing general law" did not authorize such a grant, then the special Act does provide for a case for which no "provision has been made by an existing general law."

The reasons, however, for the special Act are plain, and the additional powers conferred thereby are:

1st. The power of leasing and operating other lines.

2nd. The power to build railways on any streets of the city.

Under section 5 of the Act of 1876, ch. 242, the company could build a *main line* between the terminus at Light street and the terminus on Wilkins avenue, and *branches* from the main line. But the company desired not only to construct the main line and branches, but also to construct laterals to branches, and also railways not at all connected with either main line or branches. This it could not do under the "existing general law" under which it was organized. In the present instance the main line is the Lombard street railway, and the branch is the Park avenue and St. Paul street road; but there is now a lateral to this branch, and other laterals may be desired in the future. The special Act gives this additional power not provided for by the "existing general law."

3rd. The general law provided that the rate of fare shall be three cents per mile for passengers. The routes of this company are each over one and two-thirds of a mile

in length, and the fare of five cents, provided by the Ordinance, entitles a passenger to ride from terminus to terminus. But lest a question might, at some time, be made by a passenger who got off the line between the termini, the company deemed it proper to have the special authority to charge this rate of fare. All these were proper subjects for special legislation.

ROBINSON, J., delivered the opinion of the Court.

This is an application on the part of certain lot owners on Park avenue, to restrain the appellees from laying down tracks for a horse-railway on the bed of said street.

In support of its right to construct the railway in question, the defendant corporation relies, 1st. On Ordinance No. 150, of the Mayor and City Council of Baltimore, authorizing certain parties and their assigns, to build a horse railway on certain streets named in the Ordinance, upon terms and conditions therein prescribed.

2dly. Its charter under the general railroad law to build a street railway, between certain termini in said city.

3dly. The Act of 1882, ch. 47, authorizing the defendant corporation to construct and operate a street railway in conformity with the Ordinance No. 150; and to charge such rates of fare as may be prescribed by the Mayor and City Council, and to lease and operate other railways in said city.

Other grounds in addition to these are also relied on, but, in the view we take of the case, it is unnecessary to state them here.

The right of the defendant corporation to build a street railway, is not therefore based *solely* on the Ordinance No. 150, of the Mayor and City Council, and the question whether the municipal authorities, in the absence of express legislation on the subject, had the power to authorize a joint stock company or its assigns to use the streets of the city for the purposes of a horse railway, does not necessarily arise.

Whatever conflict, if any there be, in the decisions of the several States on this question, it is well settled that the Legislature in the exercise of its sovereign powers may authorize the use of the streets of a city or town for such a purpose, and that such a use is not an additional servitude for which adjoining lot owners are entitled to compensation. *Cooley Const. Limitations,* 547–560; 1 *Red. Railways,* 314–326; *Elliott's Case,* 32 *Conn.,* 579; *Hinchman's Case,* 2 *C. J. Green,* 76; *West vs. Bancroft,* 32 *Vt.,* 367; 21 *Illinois,* 522.

The right thus to use the streets of a city for a horse railway, is not based, it is true, either upon the ground of public convenience or public necessity, because the Legislature has no power to take the property of the citizen for a public use without just compensation. It rests, however, on the ground that such a use is neither inconsistent with, nor does it in any manner supersede, the ordinary uses for which the street was dedicated as a highway—that the easement thereby acquired was the right to use the streets of a city, not only according to the then existing modes of travel and transportation, but all such other modes as may arise in the ordinary course of improvement; and that a horse railway is but one of the legitimate contingencies within the objects and purposes for which the street was dedicated to the public, and which we must therefore presume, was within the contemplation of the parties, at the time damages were assessed to abutting owners. 1 *Redfield on Railways,* sec. 320; 2 *Dillon on Municipal Corp.,* 719; *Railroad Co. vs. Leavenworth,* 1 *Dillon C. C.,* 393; *Elliott vs. Fairhaven and Westville Railway Co.,* 32 *Conn.,* 519.

We do not see on what grounds such a use can be said to be the imposition of an additional servitude. The motive power is the same, and the iron rails, although laid on the bed of the street, do not materially interfere with or obstruct other modes of travel and transportation.

On the contrary, the railway in itself offers a quick and rapid transit from one part of the city to the other, thus affording greater advantages and facilities in the use of the street as a public highway. Nor is there any invasion of the legal rights of adjoining owners. Their title to the land subject to the public easement remains the same, and they have the same access to their property and to the use of the street as a highway. The cars may, it is true, be an annoyance, but not greater, perhaps, than other modes of conveyance running at regular periods. But, be this as it may, it must happen in the very nature of things, that streets will be used for legitimate purposes which may be to some extent an annoyance to persons living upon them; but this is an incident to all city property and for which there is no legal remedy. Assuming then that the Act of 1882, ch. 47, authorizing the defendant corporation to construct a horse railway on certain streets of the city of Baltimore is a valid Act, we are of opinion that the use of Park avenue for this purpose is not such an invasion of the rights of the complainants as to entitle them to an injunction. The question then resolves itself into this, is the Act of 1882 a valid exercise of legislative power ?

This Act is assailed on two grounds. First, it is said to be in conflict with sec. 48 of Art. 3 of the Constitution, which provides that corporations may be formed under general laws, but shall not be created by special Act of the Legislature. The answer to this objection is that the defendant does not derive its charter under the Act of 1882. On the contrary, it was incorporated under the general law of 1876, ch. 242; and the Act of 1882 merely amends its charter and confers additional powers and privileges. The right to amend the charters of all corporations created under the general corporation laws of this State is expressly reserved to the Legislature. *Sec. 48, of Art. 3 of the Constitution.* We find nothing in the Constitution to justify the construction that such amend-

ments must be made by general laws operating alike on all corporations. One corporation may need to have its powers enlarged, while it may not be advisable or necessary to confer such powers on other corporations. And besides, the objects and purposes of corporations differ so widely that it would hardly be practicable to provide by general law for such amendments as they might from time to time require. From the adoption of the Constitution to the present, the Legislature has exercised this power by special Acts, and the rights and privileges conferred on corporations by these Acts have been repeatedly before this Court for determination, but the power of the Legislature to make such amendments has never been questioned.

Then again, it is argued that the Act of 1882 is in conflict with sec. 33, of Art. 3, of the Constitution, which provides that the Legislature *"shall pass no special law for any case, for which provision has been made by an existing general law."* This assumes that provision has been made by a general existing law conferring on the defendant corporation the privileges claimed under the Act of 1882; and in support of this view the counsel for the appellants rely on the Act of 1831, ch. 252, sec. 856, of Art. 4, of the Public Local Laws and the general railroad law of 1876, (ch. 242.)

Now the Act of 1831, authorizes the municipal authorities on the application of a majority of lot owners fronting on any street, to pass such Ordinances as may be necessary for the construction of railway tracks, and to assess on the owners of such lots, their just proportion of the expense of such construction. It further provides that any owner of a front lot may at his own expense construct a sideling or turnout to enable him to have the beneficial use of said railway. This Act was passed long prior to the introduction of horse railways for passengers, and it is very clear that its provisions have no application or reference whatever to such railways.

In regard to the general railroad law of 1876, we should question very much but for the decision in *Oler's Case*, 41 *Md.*, 583, whether this Act was intended to apply to street railways. Few, if any, of its provisions have reference to railways of this character. Section 13 of that Act provides, that if it shall be necessary in the location of any railroad, to occupy any road, street, or ground of any kind, the municipal or other public authorities having charge thereof, and the railroad company may agree upon the manner and terms upon which the same may be used, and if said parties are unable to agree, the company may appropriate so much of the same as may be necessary, in the same manner and upon the same terms as provided for in the appropriation of the property of individuals by the tenth section of that Act, provided also that such railroad company shall be responsible for injuries done to private property. This section further provides that no railroad company shall be allowed to pass through the city of Baltimore without the consent of the municipal authorities.

Section 14 authorizes such railroad companies to charge for the transportation of passengers not exceeding three cents per mile; and for the transportation of property other than coal, ores, or other minerals, not exceeding five cents per ton per mile.

These provisions, it is plain, have no reference to the construction of street railways for passengers.

There is then no general law conferring the rights, and prescribing the terms and conditions on which the defendant was to construct and operate its railway on certain streets in the city of Baltimore; and the Act of 1882, ratifying Ordinance No. 150, and authorizing the defendant to build and operate its railway on such streets and on such conditions as the Mayor and City Council of Baltimore may prescribe, is not therefore in conflict with sec. 33, of Art. 3 of the Constitution.

Hodges, *et al. vs.* Balto. Passenger Railway Co., *et al.*

It was further argued that the defendant corporation had forfeited its rights under Ordinance No. 150, assuming it to be valid, because the work was not begun within the time prescribed by the Ordinance. This is a provision, however, intended for the benefit of the city, and one which its authorities may waive at pleasure. No principle is better settled than that a cause of forfeiture cannot be taken advantage of or enforced against a corporation collaterally or incidentally, or in any other mode than by a direct proceeding for that purpose against the corporation. *Angell & Ames on Corporations, sec.* 777, and cases cited.

There is nothing in the Act of 1828, chapter 135, under which Park avenue was opened, which limits the authority of the city or Legislature over the street. Under the provisions of that Act it became a public highway, and as such it is subject precisely to the same uses as any other street.

For these reasons the order of the Court below refusing an injunction will be affirmed.

*Order affirmed, and*
*bill dismissed.*

(Decided 13th July, 1882.)